FOX ET AL. *v.* WILLIS ET AL.

A deed fraudulent as to creditors is not void but voidable, and can be avoided only by a judgment creditor, or one claiming under him, who has taken out execution and levied on the property fraudulently conveyed.

Where a debtor conveyed property in trust for creditors, which conveyance was fraudulent as to the creditors, and afterwards gave a mortgage on a part of the same property to a creditor who was aware of the previous conveyance, for the payment of a judgment the creditor had against him: *Held,* that the mortgagee, though a judgment creditor, inasmuch as he had not taken out execution on his judgment and levied on the land fraudulently conveyed, could not call in question the validity of the prior conveyance; and that he was not protected against it as purchaser for a valuable consideration, by ch. 1, tit. 6, part 2, R. S. of 1838.

APPEAL from the Court of Chancery.   Case reported in Walk. Ch. R. 535.   The facts of the case are fully stated in the opinion of the court.

*Barstow and Lockwood,* for complainants.

*Fraser and Davidson,* for defendants.

*By the court,* WHIPPLE, C. J.   This cause comes before this court by appeal from the court of chancery.

The facts in the case, are briefly as follows: Clarke, being indebted, and probably insolvent, executed to one Dallee a general assignment of all his property for the benefit of his creditors; the assignment bears date 9th June, 1838.   On the 20th June, 1838, Fox and Coleman, having a claim against Clarke and one McCreary, obtained judgment against them in the circuit court of the United States.   On the 11th July, 1838, the defendants, Willis', also obtained a judgment in the same court against Clarke and McCreary, founded upon a pre-existing demand.   Upon the 27th Feb., 1839, the Willis' issued their execution on their judgment.   On the 7th August, 1839, Dallee, the assignee, died intestate.   On the 20th August, 1839, Clarke executed to Fox and Coleman a mortgage, to secure the payment of their judgment.   On the 1st of October, 1840, the Willis' filed their bill in the circuit court of the United States to set aside the assignment made by Clarke to Dallee.   On the 1st March, 1842, the court made a decree setting aside the assignment as fraudulent; and the property in dispute in the present case having been placed in the hands of Drew, the receiver, he sold the same, by order of the court, to satisfy Willis' judgment.   Fox and Clarke having filed a bill to foreclose their mortgage, the Willis', who became the purchasers at the sale by the receiver, come in and contest the validity of the mortgage.

The only question presented for our consideration, is, whether the prior mortgage of the complainants shall prevail against the subsequent conveyance by the receiver to the Willis'.   The chancellor made a decree giving effect to the mortgage, to reverse which the Willis' prosecute this appeal.

It is to be observed, that the assignment by Clarke was executed previous to the Revision of 1838, which took effect on the 1st August,

Fox *et al. v.* Willis *et al.*

1838; and that the conveyance to Fox and Coleman, by way of mort-gage, was on the 20th August, 1839, a little more than one year after the revision took effect. The validity of the assignment, therefore, is to be tested by the Revision of 1833, and the mortgage by the Revision of 1838.

The Revision of 1833 embraces the provisions of 13th and 27th of Elizabeth, in respect to conveyances to defraud creditors and purcha-sers. By the 13th of Elizabeth, it is conceded by counsel, that the assignment executed by Clarke to Dallee was constructively fraudulent, inasmuch as it was burdened with conditions which contemplated a release by his creditors before they could avail themselves of its pro-visions.

The right of insolvent traders to execute voluntary assignments for the benefit of their creditors, is unquestioned, when they do not conflict with the policy of the bankrupt laws; they are regarded as substitutes for a commission in bankruptcy. Such trust conveyances, containing covenants on the part of the trustee, and stipulations beneficial to the creditors, are to be deemed and taken as founded upon a valuable consideration. The trustee, therefore, is, in legal contemplation, a purchaser for a valuable consideration, and becomes vested with the legal estate in the property assigned. 2 John. Ch. R. 189; 10 Pickering 413; 2 Kent's Com. 533. And it is always competent for the creditors, who are the parties beneficially interested in the conveyance, to compel the execution of the trust, though they be not at the time assenting, and parties to the as-signment. 4 John. Ch. R. 529; 11 Wheaton 97; 4 Mason 206; 2 Kent's Com. 533. It is also said, that in respect to persons who are absent, their assent to such assignment will be presumed, until their dis-sent is expressed, if the conveyance be beneficial and founded on a val-uable consideration. 2 Kent's Com. 533. If the assignment is made to *trustees,* and with their knowledge and privity, the assent of the *creditors* is not necessary to its validity. It appears affirmatively, on the face of the assignment by Clarke, that Dallee assented to it, and undertook the execution of the trust which devolved upon him.

Having laid down some of the general rules applicable to voluntary assignments by insolvent debtors, I shall now proceed to consider the questions raised by counsel on the argument, and involved in the case before us. That they are not free from difficulty, is readily admitted.

If considered, with reference simply to the provisions of the statutes by which the rights of the parties are to be determined, the burden would be comparatively easy; but when considered in the light of judicial decisions, those difficulties increase to an extent which renders it almost impossible to arrive at conclusions satisfactory to one's self. In the wide range of subjects which have claimed the attention of courts of justice, I know of none in respect to which there has been a greater diversity of judicial opinion than that upon which the judgment of this court is now to be pronounced. The sages of the law, both in England and this country, have entertained opinions diametrically opposite upon the true construction of statutes, alike distinguished for the clearness and simplicity of the language in which they are couched, as in the object the legislature had in view in their enactment. The industry of counsel has collected many of the adjudged cases to be found in the books upon the vexed questions which were so ably discussed. Those cases have been carefully examined, with many others which fell under my observation in the course of the somewhat minute and extended examination I have felt it my duty to give to the case before us. A review of those cases would involve an amount of labor I am not disposed to encounter, and would extend this opinion to an unreasonable length; the most I shall attempt, is, to state the conclusions to which I have arrived, and refer to such of the adjudged cases as support them.

It is proper to bear in mind, that the universally received doctrine now is, that the statutes of the 13th and 27th Eliz, are a legislative recognition of the common law: this fact will aid us in giving to these statutes a true construction.

The proposition sought to be maintained by the complainants is, that being *creditors* of Clarke, the assignment was, as to them, *void*; and being *void*, Clarke had a right to execute to them a mortgage for the security of their debt, upon lands previously assigned to Dallee.

It is admitted that, in respect to conveyances to defraud creditors, the statute declares them " utterly void;" and yet in the same section in which these words are found, such conveyances are to be deemed and taken as " utterly void " only as against the person or persons whose actions, suits, &c., " might be in any wise disturbed, hindered, delayed or defrauded."

Construing, therefore, the last clause of the section by what precedes

it, we are enabled to arrive at the true interpretation of the words " utterly void." It does not mean to declare that such conveyances are *mere nullities*—void to all intents and purposes—but simply *voidable.* No act can be regarded as *absolutely void,* and of consequence a *mere nullity,* which takes effect as to some purposes. Chief justice Spencer, in the case of Anderson *v.* Roberts, 18 John. R. 515, gives a true interpretation of the words " utterly void," as used in the statute of 13th Eliz., when he says, that " whenever the act done takes effect as to some persons, and is void as to persons who have an interest in impeaching it, the act is not a nullity, and therefore, in a legal sense, is not utterly void, but merely voidable."

At the common law, such conveyances are, as against the fraudulent grantor and his representatives, valid and effectual: if so, it cannot be contended that the statute, which is simply in affirmance of the common law, establishes a new rule. Mr. Justice Story, in the case of Bean *v.* Smith *et al.,* 2 Mason 252, says, " a conveyance to defraud purchasers, or to defraud creditors, is not *utterly void,* as has been sometimes supposed : it conveys the estate effectually as between the parties and their representatives, and the estate may be maintained against all persons but those whom it was intended to defraud."

Many other authorities in corroboration of these views might be cited, but it is deemed unnecessary to notice them at this time, especially as they will be found sustained by cases I shall have occasion to refer to before concluding this opinion.

It may be proper to remark here, that although a voluntary assignment to defraud creditors is not " *utterly void,*" it may be admitted that courts, in administering remedies, treat the instrument as *void* in respect to those who are " hindered, delayed or defrauded," in their " actions, suits," &c. Or in other words, for the purpose of satisfying the claims of creditors, will treat the property conveyed, as though it still remained in the hands of the fraudulent grantor.

We are now prepared to consider the question whether Clark, being indebted to the complainants, could grant, and the complainants take a mortgage upon any of the real estate described in the assignment to Dallee, as a security for their debt. This will lead us to a consideration of the course proper to be pursued by a *creditor* who is " delayed, hindered or defrauded," in his " actions, suits or debts," within the meaning of the statute of the 13th Elizabeth.

Roberts, in his Treatise, on the construction of the statutes of 13th and 27th Eliz. p. 422, says: "The statute 13th Eliz. does not enlarge the natural jurisdiction of any court, by furnishing any new remedies. It merely avoids the voluntary act, leaving the rest to the consequences and remedies of law: where the lands and chattels are voluntarily and fraudulently transferred, the statute 13th Eliz. avoids the transfer as against creditors, who have a right to regard the property as unaltered, and still subject to their executions; but the statute helps them no further than by allowing them to avail themselves of this construction by the judicial remedies which flow from their rights."

The form of the remedy, and the circumstances under which it is administered, in favor of a creditor defrauded, under the 13th Eliz., is thus stated by Hovenden, vol. 2, p. 75: "To induce a court of equity to set aside a settlement, as being fraudulent under the 13th Eliz., the complaint must be made by a creditor who has put himself into a situation entitling him to apply for the aid of the court, by having obtained a judgment for his debt, and showing that, by the settlement, he is defrauded of the fruits of his judgment: for a voluntary settlement is void under this statute only as against creditors, to the extent in which it may be necessary to deal with the estate settled for their satisfaction: to every other purpose it is good: satisfy the creditors, and the settlement stands."

The text is illustrated by the case of Colman *v.* Crocker, 1 Ves. 161. George Colman, junr., committee of his father, brought a bill to set aside a voluntary settlement made by the lunatic, in trust for the benefit of the defendant. An order was moved for in behalf of the defendant, to sell the plate, linen, china, &c., to let the house, and to bring the property into court. The solicitor general, in opposition to the motion, stated that the lunatic's property was insufficient to pay his debts, and that the settlement was obtained by fraud. The lord chancellor refused the order, on the ground that there must be a creditor to complain of the fraud, who had put himself into a situation to do so, by getting judgment for his debt, and stating that by the settlement he is defrauded.

In the case of Spader and others *v.* Davis and Hadden, 5 John. Ch. R. 281, it appears that Davis had executed to Hadden an assignment, in trust, to pay all his creditors on condition that they would release

and discharge him within thirty days. Hadden sold the assigned property and converted the same into money; and the trust having, as he alleged, become void in consequence of the creditors not having come in, he paid the assignor of those moneys from time to time, leaving a balance in his hands, at the time his answer was filed, of about $800. The chancellor, upon these facts, remarked, "that the complainants, at the time of filing their bill, had acquired, *as execution creditors at law,* a priority of right, valid in equity, to the trust moneys belonging to Davis, in the hands of Hadden; and that all payments of the same by Hadden to Davis, subsequent to the filing of the bill, containing notice of that right, and of their claim in pursuance of it, were made in his own wrong."

This case shows that the assignment, although fraudulent, was yet valid as between the parties, and continued such, until impeached by an *execution creditor.* Indeed, so effectual was it as between the parties, that the trustee was held to account only for what remained in his hands of the trust moneys at the time of the filing of the bill.

In the case of Brinkerhoof *v.* Brown, 4 John. Ch. R. 672, a bill was filed by a creditor to set aside as fraudulent a judgment, and to discharge from it certain real and personal estate which had been sold. The complainants' bill was dismissed, on the ground that, at the time of the filing of the same, they had not acquired a lien at law upon the real estate, as judgment creditors: nor had they, at the time of the entering of the decree, acquired, as execution creditors, a legal preference to the personal property by means of an execution · duly issued and levied, or returned, nor shown that they could not obtain satisfaction of their debt by having tried in vain the ordinary process of such execution at law.

These cases, while they establish the jurisdiction of a court of equity to grant relief to a creditor who is aggrieved by the transfer by his debtor, of his property, whether that transfer was by grant or by means of a judgment fraudulently confessed, also indicate very clearly that creditors are left by the statute of 13th Eliz. to pursue the property fraudulently conveyed by their debtors, in the ordinary course, under existing remedies.

In the case of Bayard *v.* Hoffman, 4 John. Ch. R. 451, the property in controversy between the parties was public stock of the United

States. Upon the argument it was contended, that as stock was not subject to an execution at law, it is not within the statute of 13th Eliz., and Roberts, page 423, was cited in support of this ground. It is there stated, "that to the remedy at law, under this statute (13th Eliz.) there is a natural boundary affixed, where the voluntary gift is of money, or other flux or consumeable chattel; for the creditor must wait till he has prosecuted his suit to execution, before he is ripe for litigation upon the statute in question."

Chancellor Kent, however, held, that though the property could not be followed in the hands of the fraudulent grantee by execution at law, yet as a debtor might, under shelter of such a doctrine, convert all his property into stock, in defiance of his creditors, it would be productive of great injustice, and refused to recognize it as sound, and decreed accordingly.

This case, then, presents an exception to the general rule, that a creditor is bound to follow the property of his debtor, in the hands of his fraudulent grantee. The exception proves the existence of the general rule.

The next case I refer to, is that of Wiggins and others *v.* Armstrong *et al.*, 2 John. Ch. R. 144. The complainants, in their bill, alleged that two of the defendants were embarrassed, and, to *defraud the plaintiffs*, gave judgments to a large amount: that the plaintiffs had commenced suits against the defendants, but had not obtained judgments. The plaintiffs prayed for an injunction against proceeding on the alleged fraudulent judgments by execution. The chancellor, in delivering his opinion, uses this language: "My first impression was in favor of the plaintiffs; but upon examination of the cases, I am satisfied that a creditor at large, and before *judgment and execution*, cannot be entitled to the interference which has been granted in this case. In Angell *v.* Draper, 1 Ver. 399, and Shirley *v.* Watts, 3 Atk. 200, it was held, that the creditor must have completed his title at law by judgment and execution before he can question the disposition of the debtor's property." The chancellor, after citing other cases, concludes as follows: "The reason of the rule seems to be, that until the creditor has established his title, he has no right to interfere, and it would lead to an unnecessary, and, perhaps, a fruitless and oppressive interruption of the debtor's rights. *Unless he has a certain claim upon the property of the debtor, he has no concern with his frauds.*"

The case of Austin *v.* Bell, 20 John. R. 442, illustrates and confirms the rule as laid down in the authorities already cited. Bell, as sheriff of the county of New York, levied upon certain goods to satisfy two executions issued on judgments obtained by one Lambert, against E. Secor and Co. These goods were claimed by Austin and Andrews, by virtue of an assignment executed to them by Secor and Co., for the benefit of creditors. The levy was made before the expiration of the time limited by the assignment for the creditors to come in and execute it. Chief justice Spencer, in delivering the opinion of the court, remarked, that "Lambert, by suing E. Secor and Co., and by issuing executions on his judgments, had definitively made his election, and taken his stand, not to come in under the assignment, nor to execute it; therefore, as regards him, he is in the situation of a creditor refusing to execute the assignment, and able to make the objection, as well before as after the first of November, 1819, that it is void."

This case affirms what I have always supposed the law to be; that assignments, though fraudulent under the 13th Eliz., were nevertheless to be considered valid until a judgment creditor appeared, seeking in the ordinary way to enforce his legal remedy against the deed. It is by such a proceeding that a creditor is to make his election whether he will come in under the deed or not: if it be not pursued, his assent will be intended. The right of the defendant to a recovery was placed by his counsel (Judge Oakley) on the precise ground, that Lambert was a creditor "pursuing his legal remedies."

To the same effect is the language of the learned judge in Anderson *v.* Roberts, 18 John. R. 515; when discussing one of the questions involved in that case, he says: "The fee is not in abeyance, and the inevitable conclusion is, that the legal title has vested in the fraudulent grantee, subject to be divested, if the creditors see fit to call in question the fraudulent conveyance, *and after the creditor has proceeded to sell, on execution, the lands thus fraudulently conveyed.*"

Vice chancellor Mc Coun, in the case of Henriquies *v.* Hone, 2 Edwards 120, says: "Now, as between Moffatt, and Hall and Swan, the assignment is still good: neither of them are at liberty to invalidate it; and as respects the defendant himself, he has taken no steps to set it aside, nor is he in a position to attack the same, on account of not having obtained a judgment against his debtor. And so far from putting

himself in the position of a judgment creditor, he appears to have been content to remain a creditor at large, and to come in under the assignment for a dividend or dividends, upon the terms which the debtor thought proper to prescribe. The defendant admits his never having disputed the validity of the assignment. Although the assignment may be void as to creditors generally, legal measures are still necessary on their part to avoid it; and he who does not join or concur in proceedings for the purpose, and takes no steps to place himself in a situation to receive a benefit from the debtor's property, except such as the latter chooses voluntarily to allow, must be deemed as acquiescing."

But it is said that, although this case was affirmed, upon appeal, by the chancellor and court of errors, still the reasoning of the vice chancellor was repudiated, for the reason that the appellant tribunals put their decision on the ground that Hone assented to the assignment by executing the same: that he could not, therefore, complain that it was void.

I do not understand the reasoning of the vice chancellor upon that feature of the case I am now considering, as overthrown either by the chancellor or the court of errors.

Hone having assented to the assignment, was considered by the chancellor as decisive of the case. The same view was taken by the court of errors. " This (says the ch. justice) is the true ground upon which the decision should rest, and upon this ground it cannot be controverted."

Hone was a creditor of the assignor: the assignees had placed a part of the assigned property in his hands, as auctioneer, to be sold. In his answer, he states that he sold the property on the 2nd November, 1832, more than four months previous to the rendition of the judgments in favor of the creditors, who filed their bill to set aside the assignment. It was contended by Hone, that the assignment being fraudulent as against creditors, he had a *prior* lien upon the proceeds of the goods in his hands. In answer to this position, the chief justice remarked: " He (Hone) insists that he acquired a lien on the 2nd Nov. 1832. *As against judgment creditors, pursuing their legal remedies* by creditors' bills, he has acquired no lien whatever. It is true, as he insists, that the assignment was declared void, but it was so declared as against the creditors who had filed their bill, not as against the parties to it, or those creditors who had assented to it."

Fox *et al. v.* Willis *et al.*

I do not comprehend the force of language if this does not sustain the views of the vice chancellor, so far as it prescribes the remedies to be pursued by a creditor who has been delayed or hindered in the collection of his demand by a fraudulent assignment.    Suppose that Hone, with a full knowledge of the existence of the assignment, had received the goods to sell as auctioneer from the assignees; and having actually sold the same, should retain the proceeds in his hands, to satisfy his claim against the assignor.    Could he, as against a creditor who had obtained judgment, issued execution and filed his bill to set aside the assignment and to obtain satisfaction of his judgment, hold the proceeds so obtained?    I think the judgment creditor would be deemed to have acquired the *prior* lien; and that it would be an unanswerable objection to the claim set up by Hone, that, having a full knowledge of the assignment, he had not adopted such legal measures as the law has provided for enforcing his rights.    He would be told that, before he can complain of the fraud, his claim must be adjudicated upon and ascertained by a court of justice, which the law presumes is armed with sufficient power to enforce its judgments: that " unless he has a certain claim upon the property of his debtor, he has no concern with his fraud."

A reference to two or three other cases will complete my examination of the question under consideration.

It was held, in Murray *v.* Riggs, 15 John. R. 572, that " where a creditor is pursuing his debtor with a judgment and execution, or in any other manner, to enforce the payment of his demand, an assignment of the debtor's property, containing a power of revocation, may be very well considered as made to *delay, hinder or defraud* creditors, according to the language of the statute of frauds. But I do not see how it could in any sense be said to *delay* or *hinder* a creditor, who was taking no measures to enforce payment of his demand, as is the case now before us.    For anything that appears, all the creditors of Robert Murray and Co. were satisfied with the assignment, and the provision there made for the payment of their debts."

Chief justice Thompson distinguishes this case from that of Clark *v.* Hyslop, 14 John. R. 465. He says: " Clark then was a judgment creditor, and had issued an execution against his debtor, which was levied upon the property assigned to Hyslop.    The levy was made at a

time, too, when, by the very terms of the assignment, the property was not held under it; that is, after some of the creditors had refused to come in and accept of the terms proposed, and before any new trust was declared, pursuant to the provisions in the assignment." He considers the language of Lord Ellenborough, in Meux *qui tam v.* Howell 4 East. 14, as establishing the proposition that no creditor could be delayed or hindered, within the sense and meaning of the statute of frauds, except such as were taking some measures to recover their debt.

It would be useless to multiply authorities upon a point in respect to which there seems to be an entire uniformity of opinion among judges both in England and this country. Indeed, it would appear to be one of the very few questions arising upon the construction of the 13th Eliz. in respect to which judicial opinions are entirely harmonious.

Nothing now remains but to apply the principles of these decisions to the facts before us.

The assignment to Dallee was executed on the 9th June, 1838. The complainants obtained their judgment against Clarke and McCreary on the 20th June following. No steps to enforce that judgment were ever taken by them. It might be well inferred that the prosecution of their suit (which was pending at the time of the execution of the assignment) to judgment, was an assertion on their part of dissatisfaction with the terms of the assignment, and of their purpose to avail themselves of their legal remedies as creditors, to test its validity, and obtain satisfaction out of the trust property. But obtaining judgment was but one step in the proceedings by which they could hope to achieve their object. The judgment not being, of itself, a lien upon the property, another step became necessary to render that judgment available: they were bound to take out their execution, and if no property of either Clarke or McCreary could be found upon which to levy and satisfy the execution, then the plaintiffs were at liberty, if the assignment was fraudulent as to them, to levy upon the property embraced in the assignment, or so much of it as was necessary to satisfy their execution. The levy being made, it would have been competent for the plaintiffs either to sell the property, or to ask the interference of a court of equity in aid of their execution at law. If a sale is made, it would then be competent for the purchaser, who would succeed to the rights of the creditor, to bring an ejectment, and thus test the validity of the assign-

ment. If the other remedy be adopted, a court of equity, upon a state of facts warranting the conclusion that the assignment was fraudulent in respect to a creditor, who had pursued his legal remedies to every available extent, would remove the obstruction fraudulently interposed by his debtor, and decree satisfaction of the execution by a sale of the assigned property.

But the plaintiffs in the present case took no legal measures whatever to obtain satisfaction of their judgment: nor did they, or any other creditor, manifest any disposition to assail the assignment as fraudulent, until the Willis' filed their bill in 1840. How, then, can it be said of the plaintiffs that they are *hindered, delayed or defrauded* in the collection of their debt, when they do not avail themselves of the means which the law has placed in their hands to enforce its collection? The statute, 13th Eliz., declares assignments fraudulent as to those creditors, and those only, whose " actions, suits, &c." are " in any wise disturbed, hindered, delayed or defrauded."

Again: the right of a creditor to avoid a fraudulent conveyance, grows out of the fact that he cannot otherwise be paid out of his debtor's estate. Suppose that his debtor has other property beside that embraced in a fraudulent conveyance, sufficient to satisfy his debt. A court of equity, if that fact should appear, would not set aside the fraudulent conveyance until he should exhaust the property not embraced in such conveyance. And this, for the reason that he cannot complain that he is delayed or hindered in the collection of his debt, when property sufficient for its satisfaction is subject to an execution at law. If he can, by pursuing his legal remedies, obtain payment of his debt, it does not lie in his mouth to complain of the fraudulent conveyance. All that he can ask, is, that he be paid; and the law will not presume that he cannot, until, by the return of an execution, that fact is shown. In the case before us, the plaintiffs never sued out an execution : if they had, it may be that satisfaction might have been obtained out of the copartnership effects, which were primarily liable for the payment of the copartnership debts; if the joint property had been exhausted, then it would have been competent to make the judgment out of the individual property of Clarke or McCreary.

It is not enough for a creditor to say that he is defrauded, but he must furnish evidence of the fact. The evidence of this fact, required

by statute 13th Eliz., is, first, that he .has obtained a judgment; second, that he has issued an execution upon the judgment; and, third, a return, which shows that it has been ineffectual: nothing short of this will do.

There being, then, before us, no evidence by which we can intend that the plaintiffs could not have collected their judgment either from the individual property of Clarke or McCreary, they have not put themselves in a situation to complain of the alleged fraudulent assignment.

The Willis' having prosecuted their claim to judgment and execution, and having acquired title to the property through the decree of a court of competent jurisdiction, that title is to be deemed and held good as against the complainants, unless the mortgage under which they claim is valid under the provisions of ch. 1, tit. 6, part 2, of the Revision of 1838.

The first section of that chapter provides, that "every conveyance of an estate or interest in lands or the rents and profits of lands, and every charge upon lands, or upon the rents and profits thereof, made or created with the intent to defraud prior or subsequent purchasers for a valuable consideration, of the same lands, rents or profits, as against such purchasers, shall be void."

Section 2 provides, that "no such conveyance or charge shall be de-deemed fraudulent in favor of any subsequent purchaser who shall have actual or legal notice thereof at the time of his purchase, unless it shall appear that the grantee in such conveyance, or person to be benefitted by such charge, was privy to the fraud intended."

Section 4 of chapter 3 of the same title, provides, that "the question of fraudulent intent, in all cases arising under the provisions of this title, shall be deemed a question of fact and not of law."

These provisions are taken in *totidem verbis* from the Revised Statutes of New York.

The mortgage to the complainants was given on the 20th August, 1839, to secure the payment of their judgment; and, by its terms, the complainants were not only empowered to foreclose the equity of redemption under the statute, but were expressly authorized to issue execution on their judgment, and levy either on the mortgaged property or any other property of which Clarke might be possessed. Assuming that mortgagees, under this state of facts are purchasers, within the

Fox *et al.* *v.* Willis *et al.*

meaning of the statutes last above cited, we are now to determine whether they are such purchasers as are protected by those statutes. It has been held in England, that, under the statute 27th Eliz., a subsequent purchaser for a valuable consideration, even with notice, would hold as against a prior voluntary conveyance, or a conveyance founded on a good consideration, such as love and natural affection. Such voluntary conveyances, however, were considered as valid between the parties, and good against all but one who purchased for a consideration of value.

An examination of the English cases will show, that the earlier decisions attached to the phrases " intent to defraud " and " intent to deceive," a meaning more restricted than that given by the more modern decisions. That these words, as they are now expounded by the English courts, are made to embrace a class of cases never contemplated by the framers of the act, there can be no doubt. To sustain the doctrine that a prior voluntary conveyance, merely because it was voluntary, is void as against a subsequent purchaser for value, the ingenuity of judges was tasked to invent reasons which should sustain and justify it. Resort was had to legal artificial presumptions, false in fact, unsound in principle, and immoral in their tendencies. The word " voluntary " is not to be found in the statutes of 13th or 27th Eliz. It hence became necessary, in order to sustain the doctrine which assumed every such voluntary conveyance void, to assume, also, that it was made with " intent to defraud:" for there is no necessary connection, in reason or fact, between a voluntary conveyance and a fraudulent conveyance. This was easily effected, however, by one of those legal intendments which are not unfrequently resorted to by judges, when the real fact will not answer their purpose: thus, in Colville *v.* Parker, Cro. Jac. 158, it is said, " because it was a *voluntary* conveyance at first, and shall be intended *fraudulent* at the beginning."

Stripped of all disguise, the English doctrine is, that a voluntary conveyance, though made under circumstances which repel the imputation of any " intent to defraud," and from motives the most pure and elevated, becomes tainted from the beginning with fraud when the grantor executes a subsequent conveyance for value, notwithstanding the second grantee has full notice of such prior conveyance. The fact of actual notice to the grantee, according to the English doctrine, is matter of

no moment, for the very *satisfactory and logical reason* that if he had notice, it was notice of a *previous fraudulent* conveyance. It is a little remarkable that a principle so unsound in theory, sustained by a presumption often contrary to the real fact, unwarranted by a common sense construction of the statute, and repugnant to our notions of justice and right, should have become so firmly rooted in English jurisprudence as to require the omnipotent power of parliament to eradicate it. It need not be said to the intelligent lawyer who has examined the subject, that the principle is now adhered to in England solely upon the ground of authority, and because to disturb it now would be to affect many titles built upon its rotten foundation.

In this country, judges of great ability have, on the ground solely of precedent, adopted the English rule: while others, of equal ability, have successfully resisted it as unworthy a place in American jurisprudence. In this country, the English doctrine may be considered as overthrown.

In this state, nothing is left to construction. Our legislature, in the second section of the chapter in relation to fraudulent conveyances, have declared their sense of what the law should be. No conveyance, such as is mentioned in the first section, is to be deemed fraudulent in favor of a subsequent purchaser, who shall have actual or legal notice thereof at the time of his purchase, unless it shall appear that the grantee in such conveyance, or person to be benefitted thereby, shall be privy to the fraud intended. The distinction taken in the books between fraud in law and fraud in fact, is exploded. A subsequent purchaser is not protected, who has notice, actual or legal, of a prior conveyance, unless the grantee in such conveyance, or person to be benefitted by the charge, was a *particeps criminis* in the fraud. This view is sustained as well by the notes of the revisors, as by the subsequent decisions of the courts of New York.

But it is said that there is a distinction between *voluntary* conveyances and *fraudulent* conveyances: and this idea is justified by the language of both English and American judges. That there is a wide distinction in point of fact, I have endeavored to show, but that such a distinction is admissible when applied to the doctrines I have just considered, cannot be true. The whole current of decisions which declare a conveyance merely voluntary, void in respect to a subsequent grantee

who has paid a valuable consideration, notwithstanding the grantee was affected with notice of the prior conveyance, was founded on the idea that such grantee was protected by the statute 27th Eliz.: and if so, it must have been because the voluntary conveyance was also fraudulent; for no conveyances, but such as are made with " intent to defraud" or " intent to deceive," are mentioned in the statute. Upon principle, then, but especially when considered with reference to our statute, how can the mortgage in the present case be sustained? Was it competent for the grantor (Clarke) to avoid his own deed to Dallee? This proposition cannot be sustained. According to Chief Justice Marshall, 1 Brock. R. 500, the grantee has title against all the world, except against creditors. He has a title defeasible by creditors only. It is good against the grantor and his heirs. If creditors do not object to the provisions of the assignment, surely he cannot: if they accept the terms which it prescribes, he cannot repudiate it. There is not the slightest evidence but what the creditors, at the time the mortgage was executed, were content to abide by the assignment, hard though it may have been in some of its provisions. In fact, no objection was made to it, and no attempt to defeat its execution, until the filing of their bill by the Willis'. If the instrument on its face was, in a legal sense, fraudulent, yet it bound Clarke: his creditors, and they alone, could impeach it: as to the rest of the world, it was good. But there is no reason for imputing a fraudulent *intent* either to Clarke the grantor, Dallee the grantee, or the creditors who were to be benefited by the charge. If so, how can the complainants claim under their mortgage? They had full notice of the prior conveyance, and had no right to assume that fraud in fact existed on the part of those who were the creditors of Clarke, the persons for whose benefit the trust was created. That was a question which the complainants, as creditors, had a right to try before a tribunal competent to pass upon it: that tribunal was a jury in a court of common law, or the chancellor in a court of equity.

The fact that the benefits designed by the assignment were coupled with conditions which creditors might deem inequitable and unjust, did not render it necessarily fraudulent in fact. Suppose, upon a trial of the question of fraud properly and legally made, it could be shown that the property assigned was sufficient to satisfy the claim of all the creditors; the presumption of fraud, which the law might deduce from mat-

ters apparent on the face of the assignment, would be effectually rebutted. A jury, under proper instructions, could not say that the assignment was fraudulent in fact, as it provided ample means to satisfy all the creditors, and would thus, in effect, cure that provision which contemplates a release by the creditors upon receiving a part only of their debts. Such a provision would become inoperative.

Upon the whole, I am of opinion that it was competent for the complainants, as creditors of Clarke, to impeach the assignment for matters apparent on its face: that the remedy provided by law and contemplated by the statute 13th Eliz. for the protection of creditors who are delayed or hindered in the collection of their debts, has not been pursued by the complainants: and that, not having pursued the remedy which the law provides, they cannot complain that they have been defrauded. I am further of opinion, that they cannot claim as purchasers for the reason that it does not appear that the assignment was fraudulent in fact, on the part either of Clarke or Dallee, and especially can it not be alleged that the persons to be benefitted by the charge were privy to any intended fraud.

It follows that the decree of the chancellor must be reversed.

*Decree reversed.*